(No. 93-CC-1871-)

GLENSTONE HOMEOWNERS ASSOCIATION, Claimant, *v.*
THE STATE OF ILLINOIS, DEPARTMENT OF TRANSPORTATION,
Respondent.

*Opinion filed May 13, 1996.*

MARSHALL N. DICKLER, LTD. (JEFFREY A. GOLDBERG and JAMES A. SLOWIKOWSKI, of counsel), for Claimant.

JIM RYAN, Attorney General (JOEL CABRERA, Assistant Attorney General, of counsel), for Respondent.

## OPINION ON SUMMARY JUDGMENT

EPSTEIN, J.

In this case of first impression, the Claimant, Glenstone Homeowners Association (the "association"), seeks (count I) payment of 1991-93 owner's assessments of $14,120 on four subdivision lots that were purchased by the Department of Transportation ("IDOT") in 1990, as well as attorney's fees and other collection expenses, and seeks (count II) foreclosure of the association's asserted lien on the four lots for non-payment of $9,242 of assessments, which was recorded with the Lake County Recorder (document number 3126118). Our jurisdiction is based on section 8(b) (contract clause) of the Court of Claims Act (705 ILCS 505/8(b)).

These claims are before the Court on cross-motions for summary judgment. The association's motion claims $26,256 in unpaid assessments for the period of July, 1991, through September, 1994, and attorney's fees of $13,124 and "costs" of $175.40. The Respondent's motion denies liability altogether. Both parties assert that there are no disputed material fact issues, and that these claims can be adjudicated on the questions of law presented.

## The Undisputed Facts

These claims arise from IDOT's 1990 acquisition of four lots of real estate in the Glenstone Subdivision (unit II) on the north side of Cuba Road in Long Grove, Lake County, Illinois. IDOT bought the lots from the subdivision developer for use as right-of-way for the intended expansion of FAP Route 432, i.e., for highway purposes. The $530,000 price was negotiated under threat of condemnation following IDOT's mandatory purchase offer under the eminent domain statute. (705 ILCS 5/7-102.1.) IDOT took title to the lots and related easements by quitclaim deed dated October 24, 1990, from the developer's land trustee; the deed was recorded with the Lake County Recorder on February 21, 1991 (document number 2991579).

On October 27, 1989, the Glenstone Subdivision, including the purchased lots, had been impressed with a "Declaration of Covenants, Conditions and Restrictions" executed by the developer's land trustee. The declaration, which also created the homeowners association was recorded with the Lake County Recorder on November 1, 1989 (document number 2847044).[1] (See complaint, exhibit C [certified copy of recorded declaration].) The principal covenant in the declaration that is material to the association's claims provides:

*"Article 4, Section 1: Creation of Lien and Personal Obligation for Assessments.* Each Owner of a Lot * * * by acceptance of a deed therefor or otherwise, whether or not it shall be so expressed in any such deed * * * hereby covenants and agrees and shall be deemed to covenant and agree to pay to the Association or each Lot owned * * * (1) annual assessments or charges to be paid in equal bi-annual installments (* * * "Annual Assessment") * * * and (2) special assessments for purposes including * * * major capital improvements (* * * "Reserve Assessment"). Reserve assessments are to be fixed, established and collected by the Association shall constitute the maintenance fund of the Association. The annual and special assessments, together with such interest thereon and costs of collection thereof, including * * * reasonable

---

[1] The association is a not-for-profit corporation as the declaration mandates.

attorneys' fees ° ° ° shall be a charge on the land and shall be a continuing lien upon each Lot against which each such assessment is made. Each such assessment, together with such interest thereon and cost of collection thereof, including ° ° ° reasonable attorneys' fees, ° ° ° shall also be the continuing personal obligation of the ° ° ° Owner of such Lot at the time when the ° ° ° assessment fell due."

Other provisions of the declaration also relied upon by the association are article 4, section 3 ("Computation of Assessments" [relating to the 1/24 share to be paid by each lot owner, personal liability of lot owners, and the non-exculpation of lot owners for assessments due to non-use of the association common areas]), section 4 ("Date of Commencement of Annual Assessments" [relating to delinquencies and late fees on assessments]), and article 9, section 3 ("Remedies" [relating, *inter alia*, to lien foreclosure, cumulation of remedies, and entitlement to recovery of attorney's fees and collection costs and expenses]). These covenants, conditions and restrictions ("covenants" or "subdivision covenants") in the declaration, and their enforceability against IDOT as owner of the four lots, are the subject of this dispute.[2]

IDOT acknowledges that it was aware of the declaration and of the homeowners association before it completed its purchase, and that it requested the developer-owner to provide a "release" of the four lots from the homeowners association (departmental report, August 4, 1995, at page 2.) IDOT was informed that the developer had already "turned the homeowners association over to the unit owners." *Ibid.*[3]

[2] The declaration also contains restrictions which, if enforceable against IDOT, would effectively preclude the use of the four lots for the highway purposes for which IDOT acquired them. Insofar as the record on summary judgment reflects, the four parcels have remained vacant and have not been utilized for any purpose by IDOT to date.

[3] The declaration was noted as a special exception in the second title commitment obtained by IDOT (see departmental report, exhibit I (Mid America Title Co., commitment, schedule B, number 9)); that commitment also excluded the association assessment against the lots (*id.*, exhibit I, schedule B, number 10). The company apparently removed these exceptions in its final policy (*id.*, exhibit J (Title Policy number 144-022245, schedule B).

Following an internal discussion among IDOT attorneys, the department elected to close on its purchase of the lots without obtaining a release or conveyance from the association. This was based on the IDOT attorneys' consensus that the subdivision covenants are not enforceable against IDOT, as an agency of the sovereign, for a series of reasons (see, IDOT departmental report, August 4, 1995, at pages 3-4), most of which are advanced in the Respondent's arguments on the pending cross-motions for summary judgment.

Pursuant to IDOT's lawyers' determination, and in the absence of an appropriation specifically for the payment of these association assessments, IDOT has not paid any of the association's assessments since taking title to the four lots. On February 3, 1993, the association filed its collection and foreclosure claims in this Court.

## The Parties' Legal Positions

On the primary issues presented—whether the State is liable on the covenants contained in the declaration that run with the land, especially on the affirmative covenant to pay assessments, and whether any such pecuniary liability is unenforceable against the State for some other reason, the parties take fundamentally opposing positions.

The Claimant contends that the subdivision covenants are binding on IDOT, notwithstanding its status as an agency of the State. The association maintains that the State is not exempt from covenants that were lawfully imposed on property that the State later acquired and now owns; that IDOT's purchase of the lots subjects it, by voluntary and express assumption, to the obligations of covenants impressed on the property that run with that land; and that the obligations of those covenants are enforceable in contract in this Court.

Respondent IDOT contends (1) that the State, as sovereign, is not bound by covenants running with land that it acquires as a matter of law, based apparently on the doctrine of sovereign immunity; (2) that the declaration and its covenants are not express contracts, but are instead "implied contracts" which are unenforceable against the State as a matter of law; (3) that the declaration conflicts with the Illinois Purchasing Act and is thus unenforceable against the State; (4) that even if the subdivision covenants are theoretically binding on the State, no money judgment may be imposed against the State in the absence of an appropriation for the particular contractual purpose; and (5) that the express language of the declaration exempts or excludes these parcels from the operation of the covenants because the parcels were acquired by a public body for highway purposes; (6) that the State is not obligated to pay association assessments because it does not and will not receive any benefit from such payments; and (7) that the State is not liable for attorney's fees or interest absent a statute so providing.

In reply to IDOT's contentions, the Claimant argues (a) that the declaration and its covenants are express, not implied, contracts; (b) that the Illinois Purchasing Act does not apply to those covenants, and specifically not to the covenant to pay assessments; (c) that a specific appropriation is unnecessary for an award to be made; that a lapsed appropriation is adequate; and that the 1990-1995 appropriations for IDOT in fact included appropriations of funds for land acquisition and related expenses, which encompasses the assessment obligations on these lots; (d) that the language of the declaration does not exempt IDOT highway acquisitions of subdivision property; (e) that the state, as a governmental body, is not exempt from real property covenants that run with the land; and (f) that the State is liable for interest on the overdue assessments

and for attorney's fees and collection expenses due to its express contractual obligation under the subdivision covenants.

Analysis

Count I: The Association's Claim for
Payment of Assessments

1. *Applicability of the Covenants to the Subject Parcels.*

The Court must first address the interpretative issue raised by IDOT. As Respondent points out, the other issues in this case are moot if the property is not subject to the covenant to pay assessments, which is the sole predicate of liability asserted by the Claimant. However, we do not accept the Respondent's interpretation of the exemption language in the declaration.

Respondent contends that its acquisition of the four parcels brings that land within the language and intent of the following provision of article 4 of the declaration:

"Section 7. The following property subject to this Declaration shall be exempt from the assessments created herein.

(a) All property dedicated to and accepted by a local public authority, and properties granted to or used by a utility company."

Respondent relies on the first clause. Under its language, the terms that define the scope of applicability of this exemption are "dedicated to and accepted" and "local public authority." Neither of these terms are defined in the declaration, and accordingly must be given their ordinary and accepted meanings. Respondent's effort to bring IDOT's acquisition of these parcels under the section 7 language fails both elements.

First, "dedicated to and accepted" is clearly used in its real estate context. This is a standard real estate term denoting a particular method—or two methods, if both

statutory and common law dedication are included—of transferring an interest in real estate to a public body for the purpose of a public way. In contemporary practice, this is ordinarily, but not necessarily, for use as a public street or road.

Respondent has cited no precedent for a usage of "dedication" or "dedicated" meaning a conveyance of land or of interests in land effected by quitclaim deed, as was done here. Indeed, because dedications ordinarily do not convey a fee but instead grant limited rights restricted to the surface of the land, most commonly the right of public passage, there is ample reason to believe that the declaration's use of the term "dedicated" (with its concomitant requirement of "acceptance") was an intentional choice of available terms, and was intended to restrict the circumstances in which land in the subdivision would be exempt from assessments.

IDOT would have us read this expression to encompass any subdivision land as to which an interest was granted for road or highway purposes to any public entity. The declaration simply does not say that, although it readily could have if that were the intended purpose of this clause. We find no ambiguity in the language of section 7, nor any indication in the declaration of an intent comporting with Respondent's broad interpretation.

We find it much more likely that this kind of provision—which is common in developments involving common areas—was intended to accommodate possible dedications of internal streets and sidewalks to the local municipality or township, which would then maintain them. In such event, the section 7 provision would exempt the dedicated *portions* of parcels from assessments as a way to equalize the assessment burden as between the owners of undedicated and partly-dedicated parcels.

This purpose, of course, has nothing to do with major roads adjacent to the subdivision, or with the use of eminent domain powers to acquire subdivision land, or with the removal from the residential subdivision of entire parcels as IDOT's road project would effect as a practical matter. There is no hint in the declaration that section 7 was intended to address these issues, as Respondent itself acknowledges in its brief.

Also supporting this view is the fact that the operative effect of section 7 is not to exclude the "dedicated" land (or the utility property covered by the other section 7 clause) from the declaration or from the subdivision. Thus any land "exempt" under section 7 remains subject to the other terms of the declaration, i.e., other than the assessment provisions. This suggests that section 7 was intended to cover dedicated public streets and perhaps sidewalks inside the subdivision that serve the subdivision, not roads outside the subdivision, which would be the effective result here.

Second, the term "local public authority" is inconsistent with Respondent's argument. Although neither party has cited us to any generally accepted meaning or usage of this term, it is apparent, as the association contends, that "local" does not ordinarily connote a statewide agency or jurisdiction. Respondent's attempt to call IDOT a "local" authority also fails to find support in the voluminous documentation that IDOT produces every year. As nearly as we can tell, IDOT does not refer to itself as a "local public authority" or as "local." It is very difficult to see why a drafter of an Illinois subdivision declaration might do so.

The literal and ordinary, but narrower, meaning of "dedicated to * * * local public authority" is that this language covers dedications to local governments (usually for

road or street purposes). In Illinois, as even a cursory review of our Highway Code shows, the "local" authorities having street and road jurisdiction are cities, villages and incorporated towns (often referred to generically as "municipalities"), and townships and counties. Under the 1970 Illinois Constitution, which was in effect when this declaration was written, local government includes those kinds of public bodies and "special districts." See, 1970 Ill. Const., Art. VII, "Local Government." State agencies like IDOT are constitutionally and statutorily referred to by a number of expressions but never by one including the term "local." We can find no basis for concluding otherwise for the usage intended in this Illinois subdivision declaration.

We therefore hold that the exemption in article 4, section 7 of the declaration does not apply to these lots and does not exclude them or their owner from the covenant to pay assessments.

2. *Sovereign Immunity.*

The principal defense relied on by IDOT appears to be that sovereign immunity bars the enforcement of these covenants. There is an elegantly short answer to this: Sovereign immunity ceases at the door of this Court. Once a Claimant is successfully in this Court, sovereign immunity is statutorily waived and provides no defense against State liability as it does outside of this Court. See, An Act in relation to immunity for the State of Illinois, section 1 (745 ILCS 5/1); see also, Court of Claims Act, section 8 (705 ILCS 505/8). Sovereign immunity is not a defense to claims over which we have jurisdiction under our statute.[4] It is a bit unsettling that a State agency like IDOT could so fundamentally misunderstand Illinois law of sovereign immunity.

---

[4] Respondent does not contend that we lack jurisdiction, although its "implied contract" argument is actually a jurisdictional issue which we take up separately. See Pt. 2, *post.*

We might therefore consider the possibility that IDOT relies on a different concept than sovereign immunity. Respondent might be arguing that under common law, these kinds of subdivision covenants do not *apply* to the State or to government bodies generally. This kind of argument would not rely on immunity but on substantive real estate law. However, no common law precedent or statutory basis for such a rule of construction of covenants has been cited to us by Respondent, and we are unaware of any such principle.

Accordingly, we must reject both views of IDOT's defense. The covenants apply to IDOT as any other owner; the State is not immune in this Court to liability on these covenants.

### 3. *The Implied Contract Defense.*

Respondent contends that the declaration, and thus its covenants, are not express contracts, but are instead "implied contracts" which are unenforceable against the State as a matter of law, based on long-settled precedents of this Court, e.g., *Brighton Building Maintenance Co. v. State* (1982), 36 Ill. Ct. Cl. 36. There is no need to review those precedents, which reject implied covenant claims (e.g., quasi-contract, *quantum meruit*) in this Court, because the Claimant does not dispute that point of law.

However, we must point out that the reason for this Court's rejection of implied-contract claims is jurisdictional, based on section 8(b) of our Act—our contract jurisdiction clause—which limits the contract claim jurisdiction of this Court to "claims against the State founded upon any contract entered into with the State of Illinois." Because implied contracts are *not* "founded upon" express contracts they are not cognizable here.

However, a claim based on a non-express contractual basis may nevertheless be cognizable in this Court. A

third-party beneficiary claim—which itself is not an express contract—may be "founded upon" another contract with the State that is an express contract. In that event jurisdiction lies here and the third-party beneficiary claim is cognizable. *Haendel v. State*, No. 90-CC-0234, Slip. Op. April 22, 1996, at 8-9.

Like third-party beneficiary claims founded upon express contracts with the State, this contract claim founded upon a written express covenant is similarly not an "implied contract," and is therefore not outside our jurisdiction under section 8(b) of our Act, at least not for that reason. This is clearly an express contract claim, not an implied contract claim.

We must only complete the section 8(b) jurisdictional analysis by determining whether or not the underlying express contract—here the subdivision covenants running with the purchased land—are indeed contracts "entered into with the State of Illinois" so as to bring this claim under our jurisdiction. We find, without hesitation, that the State's acquisition of title to the land subject to the duly recorded covenants and with actual notice of them made the State a party to the declaration and its subdivision covenants. Accordingly, this claim is a claim founded upon a contract with the State, and Respondent's implied contract objection is rejected.

3. *The Benefits Argument.*

Respondent contends that the State is not, or should not be, obligated to pay association assessments because the State does not, and will not, receive any benefit from such payments. We do not understand the basis, in law or in the Constitution, for this argument, and no supporting basis or precedent has been cited to us.

This argument may have been intended as an adjunct to Respondent's "implied contract" theory, i.e., that

if the association's claim were to be adjudicated as an implied contract, then the benefits analysis would be a proper defense to such a theory. However, neither Claimant nor this Court has considered this claim to be based on implied contract doctrines.

In any event, the Respondent's benefit analysis, considered as an independent defense to the Claimant's express contract claim, must be rejected as baseless.

### 4. *The Illinois Purchasing Act.*

The Respondent contends that the assessment covenant is unenforceable against the State because its acquisition was not in accordance with the Illinois Purchasing Act (30 ILCS 505/9.01 *et seq.*), which generally governs State purchases and contracts for goods and services. Respondent characterizes the contract in this case as a "contract for services" between the association and IDOT, and argues that as such it violates the Purchasing Act's requirements that such contracts be reduced to writing and filed with the State Comptroller.

This clever argument cannot be taken too seriously, for the simple reason that the "services contract" hypothecated after-the-fact by the Respondent is not a separate and independent contract. Simply put, there is no independent "contract for services" in this case that might be bid, or exempted and negotiated, or filed with the Comptroller. The contract in this case is the declaration, which contains as an integral and unseverable part the covenants that Respondent now seeks, erroneously, to treat as an independent contract.

The State's entry into that contract was an implicit part of its purchase of the four subdivision lots. Thus, if there were to be a violation of the Purchasing Act, the applicability and requirements of the Act as applied to this

land acquisition must be analyzed. That is a separate question from the point advanced by Respondent. However, neither party claims that IDOT's purchase of land for highway purposes is governed by the Purchasing Act or that the purchase under threat of condemnation in this case somehow violated that Act. This is understandable. In this light, we need not further examine that issue.

5. *Attorney's Fees and Interest.*

Respondent argues that the State is not liable for attorney's fees or interest absent a statute so providing which is missing here. Claimant urges, on the other hand, that its claims for attorney's fees and interest are not predicated on statute or Court rule or common law, but are instead contractual obligations under the declaration (article 9, section 3), which as a matter of law are as enforceable as the remainder of the declaration against a subdivision lot owner.

Claimant's recovery of these components of its damages claim rests on the enforceability of the covenant providing for payment of attorneys' fees, collection costs and interest. Respondent has cited no precedent holding that contractual obligations to pay fees, interest or similar expenses are unenforceable against the State in this Court, or in the claims forum of any other jurisdiction. However, in *Douglas v. Department of Conservation* (1977), 32 Ill. Ct. Cl. 113, 114-115, this Court allowed recovery of attorney's fees from the State as a matter of contract damages, where the contract expressly provides for them and where the attorney fees were a result of the Respondent's breach of contract, and hence, are in the nature of an expense incurred as a result of the breach. Given the precedent of *Douglas*, and the undisputed fact that this kind of collection expense is directly caused by IDOT's refusal to pay these assessments, we perceive no reason why these contractual reimbursement obligations should not be treated as any other contract obligation.

6. *Supporting Appropriations.*

The Respondent's final defense against payment to the association is its contention that even if the subdivision covenants are binding on the State, no money judgment may be imposed by this Court against the State in the absence of an appropriation for the particular contractual purpose. On this point, finally, we find principled agreement with the State in this case.

For its part, the Claimant does not dispute this appropriations principle, but instead advances two points that, if accepted, would satisfy the appropriations requirement. First, Claimant argues that the Respondent's view of what is a proper appropriation to fund or to support payment of these association assessments is excessively stringent. Second, Claimant contends that in the annual appropriations to IDOT for fiscal years 1992-1994, covering the periods for which assessment payments are sought in the Claimant's motion, there were in fact adequate appropriations to make these payments and that sufficient funds lapsed from those appropriations in those years to allow an award for the amounts now sought.

We observe that IDOT has not seriously challenged these appropriations contentions of the Claimant. However, the requirement for appropriations to support State contractual obligations is a requirement of constitutional dimensions, and this Court must exercise its own scrutiny on this issue, rather than merely side with the superior argument. Accordingly, we have reviewed the IDOT appropriations act submitted by Claimant for the subject years.

The Court concludes that appropriations for land acquisition, for maintenance of property, and for some contractual service line items are adequate, consistent with the State Finance Act, to support expenditures for these

subdivision assessments which, on this record, are for maintenance of property owned by IDOT. We are also persuaded that Claimant is correct that sufficient funds lapsed in these years from suitable line items to support an award in this case.

Count II: Foreclosure of the Association's Lien

In count II, the association seeks to foreclose its lien under the declaration on the four subdivision lots, and thus to foreclose on IDOT's title to those properties, in order to recover the unpaid assessments that are, also, the subject of the count I contract claim. The Respondent has interposed a number of legal and jurisdictional defenses to the count II foreclosure action.

However, in light of our summary judgment on count I and our determination to make an award, the basis of the count II foreclosure action is now moot, at least for the present. We therefore need not take up the technical issues involved in the litigation of count II, and will dismiss count II without prejudice to renew it if for any reason the assessed payments awarded herein are not paid, or for other good cause.

Conclusion and Order

The subdivision covenants are contractual obligations that run with the land, and bind all owners, including the State. As contractual covenants running with and benefiting and burdening these lands, they take on the character of interests in land. IDOT acquired the four lots but did not acquire the association's interest in the lots, as it plainly ought to have done, and thus its quitclaim deed brought less than might have been prudently expected. We have held that IDOT is subject to the covenant rights against those lots. But that will not end this matter.

Unfortunately, those covenants will continue to impose at least an annual obligation on the State, and possibly more, subject to the availability of appropriated funds. We take the unusual step of pointing this out because of the obvious, but serious, concern that this case will return on an annual basis until either the State conveys away these lots or effects a settlement with the association or acquires the association's interests in the covenants on these lots.

Accordingly, it is ordered:

A. The Respondent's motion for summary judgment is denied;

B. The Court finds that there are no disputed questions of material fact as to count I of the complaint, and that the Claimant is entitled to judgment as a matter of law; Claimant's motion for summary judgment as to count I is granted;

C. Summary judgment on count I is entered for Claimant and against Respondent;

D. Claimant Glenstone Homeowner's Association is awarded the sum of $39,555.40 for the following:

(1) For assessments for July, 1991 through September, 1994: $26,256.

(2) For attorney's fees for collection: $13,124.

(3) For costs of collection: $175.40.

E. Count II of the complaint is dismissed without prejudice.